My name is Larry Popofsky, and I am counsel for PeaceHealth. And as the Court knows, we have on appeal today here single firm conduct alleged to violate Section 2 of the Sherman Act. That is conduct which, for several years now, the Supreme Court has repeatedly said should be viewed with great caution in terms of applying the Sherman Act because of the fear of false positives, namely condemning conduct which is in fact beneficial to competition, even though it looks very harsh and very, very tough. Competition can look like predation. This was recognized by the Supreme Court in Moschushta, in Brook Group, to which, of course, we will return, in Trinko, and I think it was just two weeks ago in the unanimous decision of the Supreme Court in Weyerhaeuser. That admonition by the Supreme Court is particularly of concern, it seems to me, in the health care context, where the challenge is to contracts, PPO-type contracts, which are universally recognized as cost-containment devices. Nonetheless, they have been condemned as illegal in the trial court, and I think it's worth at least ticking off what the jury did. First, it found that these contracts, the bundles. Breyer. Let me say this, because you've got to keep your voice up, because you're competing with this, with this noise outside. Breyer. I'll do my best. First of all, the jury, in assessing the bundles and the contracts, found that they were not unreasonable restraints of trade under Section 1. The jury also found that the conduct by PeaceHealth, which was challenged, and I'll come back to the conduct itself, was not illegal monopoly maintenance under Section 2. It did find, however, that the conduct constituted an unlawful attempt to monopolize the selfsame market under Section 2. And I might just say, parenthetically, that poses an intellectual puzzle, which we have briefed. How can conduct, contracts, if you will, which are not unreasonable restraints of trade employed by a party which is not found to be a monopolist, nonetheless, under the rule of reason, be found to be conduct which is part of an attempt? It makes no logic. Counsel, is this your argument that the verdict on the Section 1? Yes. Should control the verdict on Section 2? What case authority are you relying upon to support that argument? The issue itself has never been addressed in that form. That's why we have briefed it and put it before Your Honors. There are several cases in the Ninth Circuit following Tampa Electric, which have flatly stated that conduct which violates Section 2, conduct which does not violate Section 1, can also not violate Section 2. Can not violate Section 2 as a matter of law. But one has to be very careful when one talks about Section 2. It has two types of offenses. One is attempts, and one is monopoly maintenance. Okay. Before you branch off there, what's the strongest case you think supports your argument that a finding of no violation on Section 1 mandates a finding of no violation on Section 2? What's the strongest case in the Ninth Circuit that you think says that? I think the CalComp case is a good case. That's the strongest one. The strongest case you have that says that is CalComp. Well, no case, let me be clear about this, because this is really quite a subsidiary argument of ours. No case flatly says that if the conduct is exonerated under Section 1, it cannot be the basis of an attempt. The cases have been more generalized and have spoken. Are you asking us to hold that? We're asking you to look at that carefully and hold it. But that's not the case. Our case doesn't support that. No case has said otherwise. No case has ever said otherwise. Why would you do that? Because it makes eminent economic and antitrust sense. Why? Why? Because if a party is not a monopolist and it has available to it bundles, exclusive dealings, all sorts of economic techniques for competition, how can they possibly know that if it employs them, they could nonetheless be found to be a violation of the attempt clause of Section 2, even though they are not unreasonable restraints of trade? As a matter of logic, how can that which is a reasonable restraint of trade morph into something which is part of an illegal attempt to monopolize? But you're not a monopolist. It's a matter of logic. As I understand it, here we're dealing with the element of an attempt claim that says there has to be some amount of predatory or exclusionary conduct. Absolutely. So as I understand your argument, although we have no precedent addressing this, you're saying conduct that is not an unreasonable restraint of trade shouldn't be considered predatory or exclusionary. It's exactly the same conduct. It's judged under exactly the same standard, the rule of reason. And it makes no sense, at least to me, that the selfsame conduct can be condemned under Section 2. How about other circuits? Has any other circuit ever adopted that theory? No other circuit has addressed it, Your Honor. How about the academics? In the academic literature, has anyone addressed that? The academics have not addressed it either. And that's because it's very unusual, I think, to find exoneration under monopoly maintenance but not under a jury. A lot of times these issues are coming up on summary judgment, you know, before a jury has made a determination under the rule of reason, I think. But in any event, as I understand your argument, it doesn't rest entirely on that. Oh, no, no. That's just one of your arguments. In fact, we could pass this entirely. Let's assume we have rejected that argument. Why should we adopt a rule saying that bundled discounts, when they're not below cost, by analogy to the Brook Group case, can't be considered exclusionary or predatory, if I'm stating the issue correctly? Well, we're now into the heartland of LePage's, which is, as my friend observes, I actually argued in the Third Circuit unsuccessfully. The argument is, under the rule of reason, that there must be clear guidance given to businesses in the context of predatory conduct charges on how they can conduct themselves when it comes to bundles. And that that clear guidance has to have some relationship between cost and sales in the analysis. That was the argument which was adopted by Judge Greenberg in the dissent in LePage's and was the argument LePage's urged. It's the argument which the Solicitor General, in the petition for cert in LePage's, thought was sound but said this issue should percolate a bit. And I must say, we are doing that which is relatively bold. We're asking you to disagree flatly. You'd like us to create the circuit split so the issue can go up. I understand that. It would be unusual, I suppose, for the same lawyer to create his own split. I'm prepared to make that attempt, Your Honor. Because I think if you look at the literature we've supplied to you, first of all, Assistant Attorney General Pate, in our reply briefs testifying before the Monopolization Commission, Modernization Commission, flatly said that he thought the decision in LePage's, because of his failure to address cost, because it does not take into account how a bundle can be anti-competitive, makes no sense intellectually. And he says, when all is said and done, it may well be that the courts have to simply say an extended book group test applied. If you look very carefully at Professor Morris' article, which we testimony as well before the Monopolization Commission, he was the former chairman of the Federal Trade Commission. It is a very, very extensive, thoroughly analysis of all the work that has been done on the question of how do you view bundles. And the one thing that he says you surely cannot do is what counsel for the opposition here argues at page 54 in their brief. There is no rule which says monopolists may not bundle discounts, period. Full stop. That is a per se condemnation of bundling by a party said monopolist. Peace helps because of our tertiary singularity in this market. So let me ask you, how do you understand LePage's? If you were going to take on LePage's. Yes, Your Honor. Would you just do it on the basis of the dissent? I'm sorry? Would you just rely on the dissent, the arguments advanced by the dissent in LePage's? LePage's was a monopolization case. So you want us, you would like us to part company with the majority en banc opinion. Absolutely. Okay. So my question to you is how would you like to see us do that? Would you just say we think that Greenberg, Justice Greenberg, Judge Greenberg, had the better argument? Or is there something else about LePage's that is dead wrong from your perspective? Well, I think the easiest way, the simplest way is to say the dissent is more persuasive than the majority. The majority is standardless, as the Solicitor General observes, as all the commentators observe. It provides no guidance for business. It does not take into account the Supreme Court's admonition about false positives. It is, in fact, an open-ended invitation to absolute, pure adjudication by gut feeling. And that is not what Section 2 should be about. There should be gut. This is exactly the issue which was before the Supreme Court in Brook Group itself. So then the jury instruction that was given here, which was taken basically from LePage's. Verbatim. How should it have been reworded? I haven't sat down to try to do it, but it would be an instruction very similar to that in Brook Group. If you find that the price of the bundle is less than the cost of producing the bundle, you may find that that is an act in violation of Section 2, or maintenance for that matter. Now, there is an alternative option which was adopted in the Ortho case, which is an attribution of rather more sophisticated text. But I have a hard time understanding how a jury could ever follow that. I think that would be very difficult for a jury to follow, and it is for that reason that former Assistant Attorney General for Antitrust Tate and the former chairman of the FTC both reached the view that in the end, in order to end up with something which, as Justice Breyer put it when he was in the First Circuit, we need a rule which is administrable. And the only rule which is going to be administrable is one which takes into account the cost and price equation. And without that, you have nothing. And that's exactly the argument which was accepted by the Supreme Court in Brook Group, where it was a single product, not a bundle. And the only question is, well, why is a bundle different from a single product? And the answer is because you can sit down as an academic and you can hypothesize, as the judge did in Ortho, you can hypothesize rare circumstances where anti-competitive conduct might occur, might occur unless you do an attribution analysis and require the jury also to find that there is a – the competitors are equally efficient. The simple rule which works and is administrable is the Brook Group extended to bundles. And that is what the academic majority – vast majority – sense LePage. LePage is – I can't remember an opinion, and a block opinion has been so roundly criticized as LePage's. Let me pose a question then. If the standard is that the price has to be lower than some appropriate measure of cost, then is our law clear as to whether the cost is marginal cost or average total cost or some other measure of cost? You could – you could worry that bone, if you wish, Your Honor, and every court shies away from it when they have the opportunity to shy away from making the ultimate decision. The Ninth Circuit generally uses marginal cost because it's the one businessmen use mostly. The Supreme Court has not yet spoken in the Brook Group context. But I would think marginal cost would be the right analysis. Is marginal cost the cost that economists would – Pardon? That economists would look at as to what's rational? I think it's what businessmen look at and what economists would say is close to the right answer. But I think there's one thing that we should not lose sight of. The bundling is exciting because, in fact, it is LePage's issue. And we are asking you to do the old thing, which is to say our sister circuit got it wrong. But one can look at this case yet a different way because at issue really are contracts, PPO contracts, for health care. They are contracts which were asked for by very sophisticated buyers, Blue Cross, Regents, as well as Providence. And they went to PeaceHealth and they said, Give us prices for your hospital services, one with McKenzie as a provider and the other without, i.e., on an exclusive basis. And in the case of Regents, the offer was 90% of our list price, discount of 10 if McKenzie is included in the panel with us, 85% if we're exclusive, a higher discount, a lower price in effect for the insurance company. You take your pick, 5% difference. Prices were going up generally because hospitals have been in desperate economic shape. Prices were going up. That was the offer. When Providence made its request, same type of process. We will offer you a 7% discount of price at 93 if McKenzie is included in the panel, 90 if they are not, 10% discount off the list. By the way, the fact that these were different was part of the Robinson-Patman Act claim, many Robinson-Patman Act claims, because we were treating Regents better than Providents in these proposals. Regents chose the exclusive offer. Providence did not. And Providence elected to pay the higher price and include McKenzie in the panel, which meant that its customers and the consumers who had its policy could, in fact, go to either hospital and receive the full benefits of their insurance without the higher copayments, which would be required if they were not in the panel. So you have prices which were offered, choices given, an exclusive contract entered into by one but not by Providence after January 1, 2002. And the question, therefore, becomes how do we evaluate those? What is the PPL? What is this contract? And the judge said flatly, well, the bundling claim you can, jury, see as de facto exclusive dealing. And he instructed that in the context of instructions on the exclusive dealing, i.e., the exclusive provisions of these PPO contracts. Now, what's the laws to those? Well, there are two tests. One test, which has been very, very strongly urged by the Department of Justice, is that if the claim under Section 2 of predation is to be made, it must be made on the basis that the conduct has no economic purpose or sense to it, save to harm competition. But PPOs, by definition, are volume discounts. Give us exclusivity so we get more customers, we will give you a lower price. So they plainly have economic sense, right aside from their impact on McKinsey. So if one applies the no economic sense test, and Greg Worden's paper is before your honors, which expresses the Justice Department's view on that, then this is an easy case. Whatever the rule of bundling is, a very easy case. If, on the other hand, one tries to do a traditional antitrust balancing, one would start out and ask, what is the harm, and is that harm outweighed? Now, can one do that as a matter of law on appeal? The answer is absolutely. The court in Gilbarco, Ninth Circuit, the leading case in exclusive dealing, which was not cited by the opposing counsel, did precisely that. Rule of reason applied on appeal. Paladin, a case I know your honor is familiar with, did precisely that. Did the balancing test on appeal as a matter of law. Smile Care, which was actually a pleading case, the Ninth Circuit held under the rule of reason that a defense was self-evidently right on a balancing test in the context of dental care as opposed to health care. So it is certainly a familiar task, which we put to your honors, which is let's do the harm-benefit equation. What's the harm here? The harm is two, only two, contracts between the hospital and insurers have been said to be exclusive and foreclosed the opportunity for McKenzie to have customers from those two contracts come to their hospital. There are, in fact, 28 insurers offering 45 plans in Lane County. Only two, but they were desirable. I'm not saying they were not desirable. They covered 15 percent and no more. Fifteen percent of the insured lies. I'm not talking about Medicare, Medicaid, or any of the other, or the obligation to pay. Fifteen percent has never been held by the Ninth Circuit to be adequate foreclosure for the harm side of the balancing test. Now I know if one looks at opposing counsel's brief, there's some confusion. There's a suggestion, well, it really wasn't just 15 percent. It was higher because one of the companies, Providence, had 10,000 lies, and if you look at the agreed facts and add 10,000 to it, you get above 15 percent in the year 2002. But what counsel forgets, and this is crucial, if you look at the agreed facts, it's clear it's only 15 percent to the last year. In the last year, Providence is essentially zero because it's not exclusive anymore. So it's illicit to add Providence figures to Regents in the last year. Providence has an open contract with McKenzie. So if you look at the numbers correctly, 15 percent is the max, and those are the only two contracts on which damages are sought. Let me ask you one, just to make sure I understand all of this. I'm not sure that I ever will if there's a lot to read and to study and to digest and whatnot here, but what extent do you look at the cost to McKenzie here, its ability to compete by lowering its – in order to – you know, one of the arguments was that in order for it to be able to participate in the Regency preferred provider program, it would have had to lower its – you know, its prices way below its cost. That – that certainly is something they claim. And Regents – They claim – but they see that the evidence supported that. Evidence of that character is utterly – I mean, there's a difference between the claim and what the evidence shows. The evidence is irrelevant, whatever the true facts are as to that. And that is as was the case in Brook Group. You don't look to the other party's costs. You look to your own costs to decide whether you're above or below cost because the theory is, as Judge Breyer did it in the – in the First Circuit and as the Supreme Court did it in Brook, the theory is that if, in fact, you are above cost, an equally efficient competitor can match it. So there is no need – So you assume that – here you would assume that – Right. That the plaintiff is – The rule assumes. Is an efficient producer. Right. And the reason the rule assumes it is very hard to make a judgment about equal efficiency. Right. And I think a case can be made on this record, and we had some of the evidences before you, that McKenzie was 5 percent lower in price, lower cost provider, as they claim, because, in fact, there were good reasons it was below – it was lower. They had less of a reputation. They had less efficiency in their central office, et cetera. It is – it's very hard to go into your competitor's costs and say, am I going to come up with a price which is below my competitor's cost? That's impossible in the real world. And that's what the Supreme Court in Brook Group said. Well, I'm going to run out of time. If I don't say something, let me just say I think that the Providence Impadman Act claim here plainly is controlled under Oregon law by Brook Group. And I might say that the predatory pricing claim here, which was instructed, and the subject of some discussion in the briefs is down to five lines in the principal brief of the opposition. So I don't think if you look at the stipulated facts that there is any serious predatory pricing claim here. You might want to save some time. I'm going to save some time. Thank you, Your Honor. Mr. Triplett. May it please the Court, I have a great deal of respect for counsel. And if there's one area where we have significant disagreement, it is that I believe this Court should focus on the facts of this case and not attempt to fashion a rule that may solve all cases for all time. And in listening to the argument, there were things which I felt it important to start off saying. First, there is this gloss that PPOs and HMOs are good and that they protect the consumer. That may be a glittering generalization, but that's not what the facts in this case prove to be. In this case, when Mackenzie Willamette sought to participate in the PPP of Regents, the response by PeaceHealth was to say that they would penalize, that they would penalize by 18 percent a decision to do that, so that they would take their rate from a composite of 76 percent to 90 percent. And at the time they said that, their internal documents said that they valued the preferred contract at 1.5 percent. So into their internal documents, if they had raised their price from 76 to 77.5, they would have been faithful to their internal documents and my client would have been allowed to participate under the Regents' agreement because he would only have had to make up that small incremental increase that was going to be charged by PeaceHealth to allow my client in. So instead what they did, they said there would be an 18 percent penalty since they possessed three quarters of the primary and secondary care market. For us to make it revenue neutral, we had to reduce our normal charge to 50 percent. The record's clear that our average cost was between 65 and 67 percent. So they issued a penalty, the effect of which was for us to match it, we would have to sell well beneath our variable costs. How do you respond to Mr. Plosky's argument that, you know, the cost of competitor B are and that in our business system, they either have to assume their competitor is equally efficient or else the law doesn't care? Let me address it in kind of an indirect way. The exclusion here was not based upon efficiency. The exclusion here was based upon the fact that we did not have two tertiary care services. So we couldn't match them in a quote. We had no way of giving them the full line of products. They had 90 percent of the invasive cardiovascular surgery and they had 93 percent of the neonatal surgery. And there was no way that we could put a bundle together. And therefore, efficiency falls to the wayside. We could not match them even if you assume that we were far and away the cheapest provider in the community. And the evidence does support the fact that we were a cheaper provider. Not merely did it cost us less, but we charged less. And so the irony of this case is that the less costly provider could not do business with regents because of the penalty that was going to be exacted by Sacred Heart, by PeaceHealth. And this isn't a situation in which you come to the market and you say, you know, prices are competitive. We discovered during the course of this case that on their neonatal practice, in 1988 they raised the price one afternoon by 75 percent. And they did that because under the Medicaid rules in the state of Oregon, if their billed price was above a certain level, an outlier was kicked in so the state had to pay more. Well, they then proceeded to go to the insurance companies and say, guess what? Your price has gone up 75 percent. Insurance companies, wait a minute, that's a little steep. So they made a deal. We're only increasing your prices by 45, by 40 percent. They took the 75 and they discounted off of it. So they were still paying 40 percent more. And they continued to do that through the time of trial. In fact, one of their witnesses said, you know, we realize that we're charging too much, but we're going to let the market catch up with us. The same set of circumstances were reflected with respect to their prices for the invasive cardiosurgery. They were charging well above the prices in Portland, Oregon. They were reaping a monopoly profit on both of those products in that community. And they were able to then turn to us. We have a 24 percent market share of primary and secondary care. And they knew that we desperately needed insured patients. We had a caseload of 42 percent that were insured. We therefore had 58 percent who are Medicaid or Medicare. Medicaid in this state pays 50 percent of your variable cost. Medicare pays your variable cost but makes not one nickel of contribution toward your fixed cost. So your only chance for survival in this industry is the commercially insured patients. And that is 42 percent of the potential patients. And if you lose any one of those, you're in trouble. For us, we had an increasing census. And we had a loss of profit. And we were in a spiral. And at the time that we were taken over, we couldn't meet peril. Let me ask you a question. So East, the defendant here, was a monopolist in the tertiary care services. Let me ask you, are you not arguing, are you, that for a monopolist, bundling is always per se anti-competitive? You're not arguing that, are you? Or are you? I would say that in the event that the competition cannot, through some secondary source, bring an additional product into the market, that the answer is yes. In other words, in the ortho case, you had the issue of could the monopolized product be replicated, and so that you had a complete line of products side by side. And here, we could not replicate either of the tertiary care services. We would never have gotten them passed to the state in its certificate of need. You probably saw in the evidence that regents actually opposed allowing us to get into cardio because it would create excess capacity in the marketplace. So when you read, if you go back and you hear where the monopolist knows that the competitor cannot match its offer. They know that right away. Right, they knew that. They knew that. They knew that in this case. They knew that we couldn't match either. Right, so they knew that you couldn't make a comparable offer. Correct. And that's what, so you're not advocating a per se rule. No. You can't. I mean, I don't think that would work. No, no, but I am saying that where you cannot replicate, and therefore the impact of what's happening is a multiplier. And that's what happened here. It was taking the 18% and now it becomes for us to make everything revenue neutral, a 54% make-up that we have to find. If there were some way, they tried, the record shows that regents tried during a period of time to introduce a product called direct glue. And direct glue is going to be something where they're going to send the patients to Portland for neonatal. That lasted less than a year. The moms were not going to go from Eugene to Portland and sit while their children were in intensive neonatal care. They're going to stay at home in Eugene. So there was no way that we could reach out and replicate those services. And therefore, we were at the mercy of the multiplier. And that's where, you know, when they talk about Brook Group, Brook Group did not involve a multiple product issue. It involved a single product, cigarettes, generic cigarettes, and the Predator had a 12% market share. And the court said, look, it's good for the consumer that these people compete down to their cost because we are going to protect equally efficient providers. We're not going to protect somebody who's inefficient that can't go to that level. But here, our efficiency means nothing with the multiplier. We were the more efficient provider of the services that we could compete on. And we were penalized for that. The marketplace was penalized for it. The consumer suffered because if the consumer wanted our primary and secondary care. It just happens that you were, it seems to be, the record seems to suggest, and I use this efficiency in quotes because, you know, counsel makes a good point about efficiency and whatnot. But what if you were not the efficient producer? If we were not efficient? Yeah, then what? You know, then do you lose because you couldn't compete? Well, I think that presents a different issue than what this record presents. But, you know, I'm still puzzled. I'm trying to figure out in a, you know, in the framework here, to what extent do efficiencies matter, if at all? Well, you know, I guess what I've heard and listened to and I've read law review articles until I just as soon not read one again. I remember Judge Solomon in this district asked, on what court does that author of the law review sit? And then he wouldn't read them. But I made the mistake of reading them. And what I came away with is this. This whole area for a businessman as we're now conducting it is very difficult to conduct your business. How do I know as a businessman whether I'm selling beneath my cost? How do I know if I'm selling beneath my marginal cost? Well, I guess I'll just keep an economist on staff and have him poke me and say, sorry, that's a little too low. That isn't the way businesses function. Now we're asking here in a bundling case for everybody to have their economist on staff so they can try to figure out whether what they're doing is good or bad. Isn't it better to have a bright line rule that says that a monopolist may not bundle where its competitor cannot replicate the entire product line? I guess that's what the issue is in part for us. But, you know, most companies I would suspect may not have economists on there. They may not all have economists on their staff, but they all have accountants either working for them or who they hire. And accountants, I'm sure, have views about what their costs are. They do. They do. And I'm sure, as you know, accountants have argued forever over what an appropriate measure of cost is and what you put into it. And I think the Supreme Court, not surprisingly, has left it completely open by saying, well, it's beneath some measure of cost, but don't ask us what that measure may be. Let me talk a little bit about the question that you started with, and that was this, if you didn't violate Section 1, therefore you can't violate Section 2. There's an underlying assumption that the jury found that there were exclusive agreements, but that they did not substantially impact or were not unreasonable restraints on trade. The defendants throughout the case asserted time and again in document and in testimony that they had no exclusives. And there's a clear difference between having an exclusive and having an exclusionary agreement. And I think it is quite logical that this jury found that the agreement was not exclusive, it was exclusionary. Had the effect of being exclusionary? Excuse me? Had the effect of being exclusionary. And when you read the instructions about what constitutes an exclusive agreement, and then you take a step back and you look at what a preferred provider situation is, it isn't exclusive, it's exclusionary. And I think the jury could have found that, and having found that it was merely exclusionary, you can draw no sustenance in from their rejection of the Section 1 claim. Correspondingly, it seems to me that there are cases, I agree with counsel, that none in this circuit directly address the if you lose Section 1, can you win Section 2. But I would recommend that you take a look at Dennis Plyer from the Third Circuit. The same issue is raised only in a sentence or two in LaPage. It is also discussed by the D.C. Circuit in the Microsoft case, and it's also discussed in the healthcare case by the First Circuit. So there are a number of cases that have addressed this issue, and I would venture to say that my reading of those cases puts us ahead of the curve on that issue. And the real question is, was the conduct under Section 2 exclusionary? What we know is that the jury had to find that there was a specific intent to monopolize. We know that the jury had to find that there was a dangerous probability of success. Indeed, the statistics at 75% and the fact that our client was about to go out of business amply supported those conclusions. So the sole question is, was their conduct exclusionary? And we believe that the use of the bundling was exclusionary. We believe, even though it was only for a short period of time, that their beneath-cost sale of healthy newborn services was exclusionary. They did that, and that happened to be our number one service to the community. Only 14% of our revenues were directed to the newborn area, and that's the area that Sacred Heart chose to sell beneath, in several instances, its variable cost. We believe that when they told doctors that they could not treat their own patients in our hospital, but rather that those patients had to be transported by ambulance at a terrible expense, that that was exclusionary. We believe that when they forced upon us the cost of a hospitalist in order to care for those patients which were their patients that they wouldn't care for, that that drove our cost up. We believe that when they were ready to build their new hospital, this wonderful half-a-billion-dollar hospital, that they chose to put it in the area that was our drawing area. Why did they do that? It was intended that they would throttle us. That was our contingent. And there was one, if we could find somebody and build a new hospital somewhere else, and there was one ideal other location, what did they do? They put a restrictive covenant that no hospital could ever be built there. What we had then was, and finally, they did control a large segment of the hospital community. One-third of all the doctors in Lane County were their direct employees. In addition to the one-third, there were another group of 10 to 15 who were paid somewhere between $20,000 and $200,000 to act as chiefs of some service. Additionally, they owned substantial interest in the oncology, the radiology, the pathology, all populated with doctors, and so the number one-third is an understated number. They probably controlled more than 40 percent of all the doctors in the community, and with the exception of the pediatricians, they were not allowed to practice in our hospital. So I think when you put everything together, you see a pattern of exclusion, a pattern of what the jury concluded meant that there was an attempt to monopolize the business that we had. One just short other area. Before you sit down, I know you have a little bit of time left, but it would be helpful if you sort of addressed the tying argument. The tying argument? All right. What's, you know, the district court found that there was no evidence of coercion, and therefore, as a matter of fact. Correct. What evidence you had was insufficient to allow the case to go to the jury. Right. We, you know, I don't, I would like to hear your argument on that. The issue, obviously, the defendants urged that because these products could be, could technically be purchased separately, that we had to show coercion to buy them as two products. And so there was no question that there were separate products, all the standards except the coercion standard. That's what the court focused upon. And what we said is that there are the two bases for concluding that the coercion element is present. All you had to show was a factual dispute. Yes. Yes. And what we felt was that the creative issue of fact was that there was economic coercion to take the entire package. And you offered an expert's declaration to that effect? We did. And secondly, there was anecdotal. They had, the trial court appears to have relied upon the testimony of a Ms. White who said she wasn't under coercion. But we had testimony that she spoke with Karen Francis, our CFO, and reported that she was held hostage. And so we felt that that created a question of fact on the anecdotal evidence as well. So we believe that there was both the evidence from the economist as well as anecdotal evidence that supported a determination that there was a question of fact on coercion. Now, the last thing I was going to talk a little bit about was this Robinson-Batman issue. And Oregon has a very unique statute. In my reading, it's the only statute in the country that is like it because it covers services. And traditionally, the Robinson-Batman Act covers the sale of commodities only. And so it's very hard for us to reach out to other states and try to draw a sense of wisdom from them because there really is nothing there. What is urged is that the Brook Group analysis applies, that the Oregon court would adopt the Brook Group analysis, and that, therefore, this case should be dismissed. The courts in Oregon have said that they will follow, they will consider federal precedent. They're not bound by federal precedent. Well, if I were sitting today in Salem and I were presented with this case, I would ask, well, what authorities are out there from the various circuits? Well, there's LePage. Well, what other cases address this that would be persuasive? Well, that's the only circuit court case, Your Honor. So how would the Oregon court address this question? I suspect that they might very well decide that LePage is the correct rule. Secondly, there's a distinction between this case and in Brook. In Brook, the finding was there's no injury to competition because prices did not fall below some certain level. The Robinson Patent Act, as adopted by the state of Oregon, also states in the disjunctive that a tendency to create a monopoly also applies. That was not before the U.S. Supreme Court. And if this court takes a look at the decision in Redmond v. Coates from the Oregon Court of Appeals, they used a five-factor test, and at the end they said, well, the only thing that we have left to determine is if the defendant was dominant. And when you read that opinion, you come away with the clear impression that if the defendant in that case had a dominant market share, the Oregon Supreme Court would have held there to be a violation of the state act, even though sales were above cost. That's all I have. Wait, don't sit down just yet. I've got a few questions for you. And I have no idea what the outcome is going to be, but I just want to make sure, there's one thing I want to make sure. In the unlikely event, from your perspective, that the antitrust claim were to be reversed, what does that do to the other claims? Well, it would leave the state Robinson Patent Act claim. There was, as I'm sure you know, a jury verdict on the common law count for interference. And under the law, as I understand it, we were required to elect the more favorable. Right, and you elected the antitrust claim. We elected the antitrust claim. What happens to the damages under the other claims? It just disappears. But would we send it back? You know, I think there is some authority that allows that. But let me say this. And I know counsel will be shocked that this is probably an area of agreement. I believe that in order for there to be a finding of a violation of the common law, that there must be a concomitant finding of a violation of the antitrust laws. There is a case that I defended involving ODS before the Oregon Supreme Court. And that's exactly what they said in that case. In order to see. The common law claim is dependent on one of the other. That's correct, yeah. Your wrongful means. The point on arguing the Robinson-Patman Act is that even if you were to lose on the antitrust claim. Yes. You could prevail on the Robinson-Patman Act. Absolutely. So my question was, well, you elected your damages under the antitrust, so. Well, they're both. See, all the judgments, all the judgments, the judgment was exactly the same amount of money for the Robinson-Patman and for the. You'd have trouble under. You'd get trouble under both. Under both. Oh, I see. So the judgment is spatially neutral as to what it covers. Okay. All right. Thank you for clarifying that. I have a general question for you. I have the same question for Mr. Popofsky. I'll let you address it before you sit down, Mr. Triplett. This is on the subject of percolating, of issues percolating. Let's say we, you know, we work at an opinion at great length, either ruling for you, your client, or for Mr. Popofsky's client, and four or five or six months later it's about to be issued. Is this issue currently percolating in other circuits? That is the issue of bundled discounts and Section 2. If you know, is this being litigated in other circuits where we might expect opinions to issue? There have been some district court opinions, and I've been watching and I'm sure counsel's been watching to see how they percolate up. And some of them discuss the bundling concept, and there's one in the Ninth Circuit, Massimino, in which in 2004 an opinion was issued which said bundling looks like a viable theory. In 2006 the district court said the facts don't fit. And then almost in a, so what? And furthermore, I don't agree with LePage, and I don't agree with Smith-Klein, and I don't agree with Ortho. He didn't help us understand why, it's just that he didn't agree. I believe that in the Sixth Circuit there is a case percolating. And maybe counsel can share, because I keep watching for these, but I could have missed one. Thank you. The district court judge who said in the Ninth Circuit that she did not agree with LePage's was Judge Felser in the Massimino case. The Sixth Circuit has the bundling question before it. It was argued it's under submission. They may or may not reach it. But percolation is what the Solicitor General of the United States urged, and so we're here to percolate. Let me sort of at the end, if I can, move up the argument. First on the interference. At page 766 of the record there is counsel's citation that if he does not prevail, that there must be an antitrust predicate for the common law interference. There's no debate about that. The Robinson Patent Act is a curious claim. I heard counsel say that LePage's should control not Brook Group. LePage's was not a Robinson Patent Act claim. Brook Group was the federal analog. It was a Robinson Patent type claim. Section 1, pardon me, Section 2 claim, which drew on the Robinson Patent Act primary line, and certainly LePage's doesn't speak to it at all. But most peculiarly, most peculiarly, there is no damage theory under the Robinson Patent Act claim that was made that works. The claim is discrimination against providence, that we, PeaceHealth, favored regents over providence. But the damage award is damages measured on the difference in price on the PPO contracts. So although the jury just took the same numbers and popped it in, there was no theory offered of damage caused by the discrimination, alleged discrimination. And it's awful hard to imagine what it would have been. These buyers, after all, they didn't know what the prices were. They were given different offers, and they chose between them. I have not yet heard from counsel, either in his brief or orally, how in the world, under health care principles, what these bundles or contracts do, which is cost-contained, can be said to be a violation because they are unreasonable and harm the public interest. We put before the court the letters from the Federal Trade Commission, which have firmly said that any willing provider-type practice, statutes in several cases proposed in the early 80s, would harm consumer interests, that there were multiple interests which were in favor of having hospitals and their customers, the insurance companies, if you will, make decisions on who and who will not be included in panels. To put it more simply, the closed-panel contracting, when it is the marketplace decision, serves consumer interests. And we have not heard one single comment about that. What we did hear, what we did hear, ably done as always by my friend, was the jury argument. Here are all the different kinds of practices which show predation. Exclusionary. Well, what are they? Citing a huge, new, wonderful investment hospital near the premises of Willamette. Most people think having hospitals near one another is a good thing, not a bad thing. But there's no law that suggests anywhere, anywhere, that that can be considered predacious. Among the other acts were acquisitions of some of the smaller hospitals in the area. There's never been a claim under Section 7 of the Clayton Act or otherwise that they were anti-competitive. In fact, summary judgment was granted on that, and still it's cited in their brief among the 15 or 20 predacious acts. There's a claim of not providing the willingness to take patients from their own hospital. What they are complaining about when all is said and done is that they are just simply smaller. Now, I can sympathize with the small person. But the fact that they are smaller does not give them a right to demand of regions or peace health or earlier providence that they be included in closed panels. That's just simply not the way the market works, nor does it serve consumer interests to permit the smaller hospital, these facts, to demand to be included within the insurance company's practices. I sympathize with them if they, in fact, were about to go out of business. They were bought, Triad, the third largest private insurance hospital chain in the United States, thought the assets there were worth a lot of money. And it's in the record that they invested in it. So one has to at least take that with, if not a grain of salt, with the assumption that we cannot make a judgment based on their supposed economic circumstances. What we can make a judgment on is that there should be no per se rule. There should be no instruction, a per se type instruction such as that given here, which in effect gives to the provider the opportunity to demand inclusion. Any willing provider by jury verdict. And that is not in the public interest. It's not consistent with Section 2. I think we're out of time. Way out of time. I appreciated your argument. Thank you. And, Mr. Triplett, like those lawyers from Boise, San Francisco and Portland lawyers can go fishing, too. I hope you guys enjoy each other. The Court will now adjourn. Thank you very much. Thank you.
judges: Gould, Paez, Rawlinson